IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

BOB BUCHANAN,

          Petitioner,

    v.

WATER RESOURCES DEPARTMENT of the
State of Oregon, and WATER RESOURCES
COMMISSION of the State of Oregon,

          Respondents.

Case No. 1:23-cv-00923-CL
(Lead Case)

**OPINION AND ORDER**

---

BOB BUCHANAN,

          Petitioner,

    v.

WATER RESOURCES DEPARTMENT of the
State of Oregon, and WATER RESOURCES
COMMISSION of the State of Oregon,

          Respondents.

Case No. 1:23-cv-00925-CL
(Trailing Case)

**OPINION AND ORDER**

---

1 – Opinion and Order

RYAN HARTMAN and JENNIFER
HARTMAN,

                    Petitioners,

        v.

WATER RESOURCES DEPARTMENT of the
State of Oregon, and WATER RESOURCES
COMMISSION of the State of Oregon,

                    Respondents.

Case No. 1:23-cv-00927-CL
(Trailing Case)

**OPINION AND ORDER**

---

GRANT KNOLL,

                    Petitioner,

        v.

WATER RESOURCES DEPARTMENT of the
State of Oregon, and WATER RESOURCES
COMMISSION of the State of Oregon,

                    Respondents.

Case No. 1:23-cv-00928-CL
(Trailing Case)

**OPINION AND ORDER**

---

GRANT KNOLL,

                    Petitioner,

        v.

WATER RESOURCES DEPARTMENT of the
State of Oregon, and WATER RESOURCES
COMMISSION of the State of Oregon,

                    Respondents.

Case No. 1:23-cv-00929-CL
(Trailing Case)

**OPINION AND ORDER**

---

GLENDA BUCHANAN STILWELL,

        Petitioner,

    v.

WATER RESOURCES DEPARTMENT of the
State of Oregon, and WATER RESOURCES
COMMISSION of the State of Oregon,

        Respondents.

Case No. 1:23-cv-00930-CL
(Trailing Case)

**OPINION AND ORDER**

---

**CLARKE**, United States Magistrate Judge:

These consolidated cases come before the Court on Petitioners' request for judicial

review of Respondent OWRD's July 2023 Orders Denying Stays. *See* Pet'rs' Br., ECF No. 22.[1]

In March 2023, the Klamath Tribes ("the Tribes"), pursuant to their state-determined

Tribal claims, made a call for regulation and requested enforcement of their water rights as to the

lake levels in the Upper Klamath Lake ("UKL"). After investigating and verifying the Tribes'

call, the Oregon Water Resources Department ("OWRD") issued final regulation orders to

Petitioners, who hold junior rights to divert water from UKL. The final orders regulated off

Petitioners' water use until October 31, 2023, or until otherwise notified.

In May 2023, Petitioners filed their petitions for judicial review pursuant to ORS §

536.075(1). The filing of those petitions automatically stayed enforcement of the final orders. In

July 2023, OWRD issued an Order Denying Stay pursuant to ORS § 536.075(6) in each case

based on OWRD's determination that a stay would result in substantial public harm. Petitioners

now seek review of OWRD's Orders Denying Stays.

---

[1] Unless otherwise noted, all citations are to the docket in the lead case, *Buchanan v. OWRD, et al.*, Case No. 1:23-cv-00923-CL.

On July 28, 2023, the Court held a hearing pursuant to ORS § 536.075(6)(a). *See* Minutes, ECF No. 30. All parties have consented to jurisdiction by a U.S. Magistrate Judge. *See* ECF No. 29. For the reasons that follow, OWRD's Orders Denying Stays are AFFIRMED.

## BACKGROUND

### I.    History and Context

#### A.    The Klamath Basin

The Klamath Basin encompasses approximately 12,000 square miles of "interconnected rivers, canals, lakes, marshes, dams, diversions, wildlife refuges, and wilderness areas" in southern Oregon and northern California. *In re Klamath Irrigation Dist.*, 69 F.4th 934, 938 (9th Cir. 2023) (quoting *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 48 F.4th 934, 938 (9th Cir. 2022)). Upper Klamath Lake ("UKL") is a large, shallow freshwater lake in southern Oregon. *Id.*; *Klamath Irrigation Dist.*, 48 F.4th at 938. UKL drains into the Link River and, "[f]rom there, water flows into and through Lake Ewauna to the Klamath River, which then proceeds southwest into California and eventually joins the Trinity River near the Pacific coast." *In re Klamath Irrigation Dist.*, 69 F.4th at 938. In recent years, drought conditions have led to "critically dry" conditions in the Klamath Basin, including in UKL. *Klamath Irrigation Dist.*, 48 F.4th at 938–39 (citing *Baley v. United States*, 942 F.3d 1312, 1323–24 (Fed. Cir. 2019)).

The waters of the Klamath Basin are home to several species of fish that are listed as endangered or threatened pursuant to the Endangered Species Act ("ESA"). *See id.* at 939; *see also Baley*, 942 F.3d at 1324. In 2012, the U.S. Fish and Wildlife Service designated UKL and its tributaries as critical habitat for the Lost River sucker (*Deltistes luxatus*) and the shortnose sucker (*Chasmistes brevirostris*). *See* Final Rule, Designation of Critical Habitat for Lost River Sucker and Shortnose Sucker, 77 Fed. Reg. 73,740 (Dec. 11, 2012).

### B.    The Klamath Project

The Reclamation Act of 1902 "laid the groundwork for a vast and ambitious federal program to irrigate the arid lands of the western states." *Baley*, 942 F.3d at 1319 (citation omitted); *see also* The Reclamation Act of 1902, Pub. L. No. 57-161, 32 Stat. 388 (codified, as amended, at 43 U.S.C. § 371 *et seq.*). "Prior to passage of the Reclamation Act, at least part of the Klamath Basin was not arid land, but wetlands or marshes that were subsequently drained and converted to farmland pursuant to the Klamath Project." *Baley*, 942 F.3d at 1319 n.7.

In 1905, Congress authorized the Secretary of the Interior to advance the Klamath River Basin Project ("Klamath Project"). *Klamath Irrigation Dist. v. U.S. Bureau of Reclamation*, 489 F. Supp. 3d 1168, 1175 (D. Or. 2020), *aff'd*, 48 F.4th 934 (9th Cir. 2022) (discussing origins and history of the Klamath Project). The Klamath Project is "a series of complex irrigation works in the region" that the U.S. Bureau of Reclamation ("Reclamation") operates "in accordance with state and federal law, except where state law conflicts with superseding federal law." *In re Klamath Irrigation Dist.*, 69 F.4th at 938 (citations omitted). In operating the Klamath Project, Reclamation has the "nearly impossible" task of balancing multiple, often competing interests in the Klamath Basin. *Klamath Irrigation Dist.*, 48 F.4th at 940 (quoting *Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1173). These interests include the Klamath Tribes' water and fishing rights, Reclamation's obligations under the ESA, and Reclamation's contracts with individual irrigators and irrigation districts. *Id.* at 940–41. The irrigators' rights are "subservient" to the Tribes' rights and Reclamation's ESA responsibilities. *In re Klamath Irrigation Dist.*, 69 F.4th at 934.

II.    **Water Rights**

A.    **Prior Appropriation Doctrine**

All water in Oregon belongs to the public. ORS § 537.110. Water rights are usufructuary

in nature, meaning water rights holders own the right to "use of water, and not the water itself[.]"

*Sherred v. City of Baker*, 63 Or. 28, 39, 125 P. 826, 830 (Or. 1912). The right to the use of water

may be subject to time and quantity limitations. *Rencken v. Young*, 300 Or. 352, 364, 711 P.2d

954, 960 n.10 (Or. 1985).

Oregon follows the doctrine of prior appropriation of water rights. *Teel Irrigation Dist. v.*

*Water Res. Dep't*, 323 Or. 663, 666–67, 919 F.2d 1172, 1174 (Or. 1996). Under this doctrine,

"diversion and application of water to a beneficial use constitute an appropriation, and entitle the

appropriator to a continuing right to use the water, to the extent of the appropriation, but not

beyond that reasonably required and actually used. The appropriator first in time is prior in right

over others upon the same stream." *Baley*, 942 F.3d at 1320 (quoting *Arizona v. California*, 298

U.S. 558, 565–66 (1936)). "Once such a water right is perfected, it is senior to any later

appropriators' rights and may be fulfilled entirely before those junior appropriators get any water

at all." *Id.* (citing *Montana v. Wyoming*, 563 U.S. 368, 376 (2011)). In Oregon, "[a] junior

appropriator's water right cannot be exercised until the senior appropriator's right has been

satisfied." *Benz v. Water Res. Comm'n*, 94 Or. App. 73, 81, 764 P.2d 594, 599 (Or. Ct. App.

1988).

In 1909, the Oregon Legislature enacted the Water Rights Act ("Act") and codified the

prior appropriation doctrine.[2] Under the Act, "all waters within the state may be appropriated for

---

[2] The Act preserved water rights acquired through beneficial use prior to 1909: "[N]othing contained in the Water Rights Act shall be so construed as to take away or impair the vested right of any person to any water or to the use of any water." ORS § 537.120; *see also* ORS § 539.010. Water rights acquired before February 24, 1909, are called "undetermined vested rights." ORS § 536.007(11).

beneficial use, as provided in the Water Rights Act and not otherwise[.]" ORS § 537.120. With few exceptions, "a person may not use, store or divert any waters until after the department issues a permit to appropriate the waters." ORS § 537.130.

### B.    The Klamath Tribes

The Klamath Tribes ("the Tribes"), a federally recognized Indian tribe, consist of three peoples who traditionally inhabited the region that now comprises parts of southern Oregon and northern California: the Klamath, the Moadoc, and the Yahooskin Band of Snake Indians. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 87 Fed. Reg. 4636, 4638 (Jan. 28, 2022); *see also* Treaty between the United States of America and the Klamath and Moadoc Tribes and Yahooskin Band of Snake Indians, Oct. 14, 1864, 16 Stat. 707 (the "1864 Treaty"); *United States v. Klamath and Moadoc Tribes*, 304 U.S. 119, 121 (1938) ("In 1864, [the Tribes] held by immemorial possession more than 20,000,000 acres located within what now constitutes Oregon and California.").

"Since time immemorial, the Klamath Tribes utilized the water and fish resources of the Klamath Basin for subsistence, cultural, ceremonial, religious, and commercial purposes." *Klamath Irrigation Dist.*, 48 F.4th at 939 (citing *United States v. Adair*, 723 F.2d 1394, 1414 (9th Cir. 1983)); *see also In re Klamath Irrigation Dist.*, 69 F.4th at 938 ("The river and its fisheries are integral to the Tribes' existence."). The Lost River sucker and the shortnose sucker play a "central role in the Tribes' cultural and spiritual practices, and they were once the Tribes' most important food-fish." *Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1173 (citations omitted).

In 1864, the United States and the Tribes "entered into a treaty whereby the Tribes ceded their interests in millions of acres of land and retained a reservation of approximately 800,000 acres abutting UKL and several of its tributaries." *Klamath Irrigation Dist.*, 48 F.4th at 939. The

Tribes retained "the exclusive right of taking fish in the streams and lakes, included in said reservation, and of gathering edible roots, seeds, and berries within its limits[.]" 1864 Treaty, art. 1, 16 Stat. 707. "In view of the historical importance of hunting and fishing, and the language of Article I of the 1864 Treaty, ... one of the 'very purposes' of establishing the Klamath Reservation was to secure to the Tribe[s] a continuation of [their] traditional hunting and fishing lifestyle." *Adair*, 723 F.2d at 1409.

The Tribes' fishing and water rights include "the right to prevent other appropriators from depleting the streams['] waters below a protected level" and "the right to certain conditions of water quality and flow to support all life stages of [the suckers]." *Baley*, 942 F.3d at 1322; *Klamath Irrigation Dist.*, 48 F.4th at 939–40, 943 (citations omitted). "These rights 'necessarily carry a priority date of time immemorial. The rights were not created by the 1864 Treaty, rather, the treaty confirmed the continued existence of these rights.'" *Klamath Irrigation Dist.*, 48 F.4th at 939 (quoting *Adair*, 723 F.2d at 1414). These rights survived the termination of the Tribes' former reservation. *Kimball v. Callahan*, 493 F.2d 564, 569 (9th Cir. 1974).

The Tribes' federal reserved rights exist independently of state law. *See Klamath Irrigation Dist.*, 489 F. Supp. 3d at 1179 ("[Tribal treaty] rights are federal reserved water rights not governed by state law." (quoting *Baley*, 942 F.3d at 1340)). However, the Ninth Circuit left quantification of the Tribes' water and fishing rights to the State of Oregon. *See Adair*, 723 F.2d at 1411 n.19 ("[T]he priority of the right is, in part, determined by state law, ... and the precise quantity of water protected must be determined in accordance with state techniques and procedures[.]" (citations omitted)).

### C.    The Klamath Basin Adjudication

In 1975, the State of Oregon initiated the Klamath Basin Adjudication ("KBA") to adjudicate the relative rights of use of the Klamath River and its tributaries in accordance with Oregon's general stream adjudication law. *See* ORS § 539.005. "Oregon law required that all parties file claims of water rights and subjected contested claims to an administrative review conducted by [OWRD] and then judicial review conducted by the county circuit court." *Klamath Irrigation Dist.*, 48 F.4th at 941 (citing ORS §§ 539.021, 539.100, 539.130). "Any person owning any irrigation works, or claiming any interest in the stream involved in the determination shall be a party to, and bound by, the adjudication." ORS § 539.100.

In 1997, the Tribes and the U.S. Bureau of Indian Affairs ("BIA") as trustee on behalf of the Tribes submitted Claim No. 622 ("KA 622") in the adjudication. Declaration of Matthew Martin ("Martin Decl."), Ex. 3 at 3, ECF No. 23-3. The Tribes and the BIA "provided extensive expert testimony regarding the methodologies for calculating the claim levels and the amount of water necessary, in time and location, to achieve sufficient water quality to establish and maintain a healthy and productive habitat for the target species in [UKL]." *Id.* at 5. After making various findings of facts as to how lake elevations affect the Lost River sucker and shortnose sucker, the Administrative Law Judge ("ALJ") concluded that the Tribes' "claimed instream flows, as reflected in Attachment A, are necessary to establish a healthy and productive habitat to allow the exercise of the Klamath Tribes' hunting, fishing, trapping, and gathering rights guaranteed by the Treaty of 1864." *Id.* at 9–13, 31. Attachment A contains a chart of minimum lake elevation requirements to be maintained at UKL pursuant to the KA 622. *Id.* at 33; *see also* Removal Notice, Ex. 1 at 22, ECF No. 1-1.

In 2013, the Adjudicator issued findings of fact and an order of determination, and, in 2014, the Adjudicator submitted the Amended Corrected Findings of Fact and Order of Determination ("ACFFOD") to the Klamath County Circuit Court. *See* ACFFOD, In the Matter of the Determination of the Relative Rights to Use of the Water of the Klamath River and Its Tributaries, Or. Water Res. Dept. (Feb. 28, 2014).[3] In accordance with ORS § 539.150, the Klamath County Circuit Court is currently managing hearings to approve or modify the ACFFOD. *Klamath Irrigation Dist.*, 48 F.4th at 941. "While the court holds these hearings, the ACFFOD regulates water use in the Klamath Basin." *Id.* (citing ORS §§ 539.130, 539.170).

Under the ACFFOD and KA 622, UKL is to be maintained at the following minimum levels as determined by elevation above mean sea level:

| MONTH | MINIMUM LAKE LEVELS (IN FEET ABOVE MEAN SEA LEVEL) |
|---|---|
| January 1 – March 31 | Consistent with flood control purposes, raise elevation as quickly as possible to 4143.0 by March 31 |
| April 1 – June 15 | 4143.0 |
| June 16 – June 30 | 4142.0 |
| July 1 – July 15 | 4141.5 |
| July 16 – August 15 | 4140.5 |
| August 16 – October 15 | 4139.5 |
| October 16 – November 30 | 4140.5 |
| December 1 – December 31 | 4141.0 |

Removal Notice, Ex. 1 at 22, ECF No. 1-1. These minimum lake levels are intended "to establish and maintain a healthy and productive habitat to preserve and protect the Tribes' hunting, fishing, trapping, and gathering rights[.]" *Id.* The Tribes' priority date for KA 622 is time immemorial. *Id.*

---

[3] The ACFFOD can be found at https://www.oregon.gov/owrd/programs/WaterRights/Adjudications/KlamathAdj/KBA_ACFFOD_00001.PDF (last visited Jul. 30, 2023).

### D. Petitioners' Water Rights

Petitioners are owners of real property located on or near UKL with appurtenant rights to make beneficial use of water from UKL for irrigation purposes. Pet'rs' Br. 5, ECF No. 22.

Petitioner Buchanan has two water rights for irrigation: Certificate No. 67133 and Certificate No. 48029. *See* Declaration of Ivan Gall ("Gall Decl."), Ex. A, ECF No. 26-1; Ex. B, ECF No. 26-2. Certificate No. 48029 has a priority date of July 2, 1976, and allows Petitioner Buchanan to divert water from UKL at one point of diversion. *Id.* Certificate No. 67133 has a priority date of May 31, 1977, and allows Petitioner Buchanan to divert water from UKL at one point of diversion. *Id.*

Petitioner Hartman has one water right for irrigation: Certificate No. 65658. *Id.* Certificate No. 65658 has a priority date of February 3, 1981, and allows Petitioner Hartman to divert water from UKL at one point of diversion. *Id.*

Petitioner Knoll has three water rights for irrigation: Certificate No. 44733, Transfer Application T-11266, and Certificate No. 67133. *Id.* Certificate No. 44733 and Transfer Application T-11266 have a priority date of December 2, 1971, and allow Petitioner Knoll to divert water at two points of diversion from a spring and tributary to UKL. *Id.* Certificate No. 67133 has a priority date of May 31, 1977, and allows Petitioner Knoll to divert water from UKL at one point of diversion. *Id.*

Petitioner Stilwell has one water right for irrigation: Certificate No. 56741. *Id.* Certificate No. 56741 has a priority date of August 24, 1982, and allows Petitioner Stilwell to divert water from UKL at one point of diversion. *Id.*

### III.    The Present Dispute

On March 1, 2023, the Klamath Tribes, with the concurrence of the BIA, placed a call for enforcement of the Tribes' determined water right claims under the ACFFOD. *See* Gall Decl., Ex. C at 1, ECF No. 26-3. The Tribes and BIA believed that "the Tribal water rights for in-stream flows and water levels are not being met at various locations or may not be met in the future based on gage data, on [their] understanding of the system, and on the potential for activities that divert or store surface water for various purposes." *Id.* The Tribes and BIA therefore requested "monitoring and regulation of water levels" in UKL pursuant to the lake elevation requirements set forth in the ACFFOD. *Id.* at 1, 12. Under the Tribes' claim KA 622, for the period from January 1 to March 31, lake elevation is to be raised "as quickly as possible to 4143.0 [feet] by March 31." Removal Notice, Ex. 1 at 22, ECF No. 1-1.

After receiving the Tribes' call, OWRD verified that the elevation of UKL fell below the required level under KA 622. Gall Decl. ¶ 11, ECF No. 26. OWRD therefore determined that the call was validated and junior rights on streams tributary to UKL or junior water rights to divert water directly from UKL should be regulated off to prevent further decreases in UKL elevations. *Id.* at ¶¶ 10, 11, 13. On March 10, 2023, OWRD issued regulation orders to forty-five landowners, including Petitioners, who hold junior rights on streams tributary to UKL or on UKL itself. *Id.* at ¶ 13. The regulation order advised Petitioners that they were "regulated off of [UKL] until October 31, 2023 or until otherwise notified by the Watermaster." Buchanan Pet., Ex. 1 at 1, ECF No. 1-1. OWRD ordered Petitioners to "[s]top diverting water immediately from [UKL,] remove check dams, closer all diversions and headgates, and shut off pumps." *Id.* at 2.

The order stated that it was a "final order other than contested case ... subject to judicial review[.]" *Id.* at 1.[4]

## PROCEDURAL HISTORY

On May 9, 2023, Petitioners filed petitions for judicial review in the Klamath County Circuit Court. *See* Removal Notice, Ex. 1 at 1–10 ("Buchanan Pet."), ECF No. 1-1. The filing of those petitions automatically stayed enforcement of the OWRD March 2023 Final Orders pursuant to ORS § 536.075(5). *See* Martin Decl., Ex. 1 at 1 ("OWRD Order Denying Stay"), ECF No. 23-1.

In their petitions for judicial review, Petitioners claim that the Tribes' call constituted a "futile call [that] OWRD should have disregarded" because the United States is a co-claimant to KA 622 and its diversions of water through Link River Dam "have directly resulted in insufficient water being available to satisfy [KA 622]." Buchanan Pet. ¶ 20, ECF No. 1-1. Petitioners also claim that "the United States' diversion and use of water from UKL" without a water right under Oregon state law "for the purpose of meeting its obligations under the ESA is not an 'existing right' or 'vested right' to the use of water from UKL" and therefore constitutes "waste" under Oregon state law. *Id.* at ¶¶ 18, 19, 21. Petitioners thus allege that OWRD's validation of the Tribes' call violates: ORS § 536.320(2); Article 1, Sections 10, 18, 20, 21, and 22 of the Oregon Constitution; and the Fifth, Tenth, and Fourteenth Amendments to the United States Constitution. *Id.* at ¶¶ 21–27. Petitioners seek a judgment setting aside, reversing, modifying, or remanding OWRD's March 2023 Final Orders. *Id.* at ¶ 35.

---

[4] A "contested case" means a proceeding before an agency in which "the individual legal rights, duties or privileges of specific parties are required by statute or Constitution to be determined only after an agency hearing at which such specific parties are entitled to appear and be heard[.]" ORS § 183.310(2)(a)(A).

On June 26, 2023, Respondents removed these cases to federal court. *See* Removal Notice, ECF No. 1.

On July 12, 2023, OWRD denied the stay imposed by operation of ORS § 536.075(5) in each case. *See* OWRD Order Denying Stay at 3, ECF No. 23-1. OWRD noted that Petitioners' "water rights are junior in priority to determined claim KA 622." *Id.* at 2. OWRD defined "substantial public harm" as "a material harm or injury having real importance or consequence upon the public." *Id.* at 3 (citing *Bergerson v. Salem-Keizer Sch. Dist.*, 185 Or. App. 649, 653, 60 P.3d 1126, 1129 (Or. Ct. App. 2003)). OWRD also defined the "public that is harmed by the automatic stay" as "that community of persons that has a reasonable expectation that the regulatory order will be enforced." *Id.* (citing *Evans v. Or. State Penitentiary, Corrs. Div.*, 87 Or. App. 514, 524–25, 743 P.2d 168, 173 (Or. Ct. App. 1987)). OWRD then determined:

> In this case, the Klamath Tribes are the sovereign and public community that has a reasonable expectation that the regulatory orders shutting off junior water rights will remain effective during the pendency of review of any petitions for judicial review of those orders. The harm the Tribes will suffer by continued diversion of water from Upper Klamath Lake by junior water right holders is material because the water in Upper Klamath Lake is essential to the water-dependent treaty resources protected by determined claim KA 622. The harm suffered is substantial because the total quantity of water described in KA 622 is necessary to support those treaty resources sustained by the waters of Upper Klamath Lake. Any reduction of water, caused by the diversion of water by junior appropriators, however incremental, decreases the amount of water available in Upper Klamath Lake and constitutes a substantial harm to the Klamath Tribes.

*Id.* (citations omitted).

On July 14, 2023, Petitioners requested a hearing on the denial of the stay. *See* Pet'rs' Request for Hearing, ECF No. 15. On July 28, 2023, the Court held a hearing pursuant to ORS § 536.075(6)(a). *See* Minutes, ECF No. 30.

## LEGAL STANDARD

"Any party affected by a final order other than contested case issued by the Water Resources Commission or Water Resources Department may appeal the final order to the Circuit Court of Marion County or to the circuit court of the county in which all or part of the property affected by the final order is situated." ORS § 536.075(1). The court may affirm, reverse, or remand the order. ORS § 183.484(5)(a). The filing of a petition shall automatically stay enforcement of the final order. ORS § 536.075(5).

"If the commission or department determines that substantial public harm will result from staying the final order, the commission or department may deny the stay." ORS § 536.075(6). "Enforcement of a final order that regulated off a diversion, appropriation or other use of surface or ground water in favor of a senior existing water right of record or senior determined claim ... [i]s not stayed if the commission or department denies the stay under subsection (6) of this section." ORS § 536.075(7). "The denial shall be in writing and shall specifically state the substantial public harm that will result from staying the final order." ORS § 536.075(6). If a petitioner requests a hearing on the denial, the court shall hold the hearing no more than twenty-one days after the request is made and the denial shall remain in effect until the hearing has been held and the court has issued a decision concerning the denial. *Id.*

## DISCUSSION

The parties dispute: (1) whether "substantial public harm" is a delegative term such that deference is owed to OWRD's interpretation of the term; (2) whether OWRD's interpretation of "substantial public harm" is valid; and (3) whether substantial evidence supported OWRD's determination that substantial public harm would result from staying the final orders. For the reasons that follow, OWRD's July 2023 Orders Denying Stays are affirmed.

## I.    Agency Deference

The parties disagree as to how much deference, if any, the Court should give to OWRD's

interpretation of "substantial public harm." Petitioners argue: (1) no deference is owed to

OWRD's interpretation of "substantial public harm" because it is not a delegative term; and (2)

OWRD's interpretation conflicts with the legislature's intent. Pet'rs' Br. 10–11, ECF No. 22.

Respondents argue: (1) "substantial public harm" is a delegative term that OWRD may interpret

within the range of discretion allowed by the statute, subject to deferential judicial review; and

(2) regardless of whether it receives deference, OWRD's interpretation is valid because it is

consistent with the legislature's intent. Resp'ts' Br. 16–25, ECF No. 24. In short, the question

before this Court is whether "substantial public harm" is a delegative term.

### A.    Standard of Review

As mentioned, the commission or department may deny a stay if it determines that

substantial public harm will result from staying the final order. *See* ORS § 536.075(6). However,

ORS § 536.075(6) does not prescribe any standard of review for a court to apply when reviewing

stay denials. Respondents ask this Court to apply the general standards for judicial review of

orders. Resp'ts' Br. 14–15, ECF No. 24. Petitioners appear to support this approach. *See* Pet'rs'

Br. 7–8, ECF No. 22.[5]

In *Bergerson*, the Oregon Court of Appeals affirmed a state agency's denial of a

petitioner's stay request under ORS § 183.482(3). *Bergerson v. Salem–Keizer Sch. Dist.*, 185 Or.

App. 649, 655, 60 P.3d 1126, 1130 (Or. Ct. App. 2003). That statute authorizes an agency to

---

[5] Petitioners argue that OWRD's Orders Denying Stays do not comply with the statutory requirements for final orders other than contested cases ("OTCC") under ORS § 536.075(1) "because they do not, *inter alia*, identify themselves as final orders other than contest[ed] cases." Pet'rs' Br. 7 n.4, ECF No. 22. However, there is no requirement for stay denials to identify themselves as "final orders" because they are not final orders OTCC. The requirements for stay denials are set forth in ORS § 536.075(6), and the requirements for final orders OTCC are set forth in ORS § 536.075(1). The final orders OTCC in these cases are OWRD's March 2023 Final Orders. *See* Buchanan Pet., Ex. 1 at 1, ECF No. 1-1.

deny a stay of an order in a contested case, subject to review by the Oregon Court of Appeals. *See* ORS § 183.482(3). The statute neither specifies any standard of review nor characterizes a stay denial as a "final order." *See id.* However, in affirming the state agency's denial, the Oregon Court of Appeals nevertheless characterized the denial as an "order denying a stay" and applied the standards of review that govern judicial review of final orders in contested cases under ORS § 183.482(8). *Bergerson*, 185 Or. App. at 655–56.

The Court adopts a similar approach here. Although a stay denial under ORS § 536.075(6) is not a "final order" for all purposes, the Court will review the stay denial according to the standards of judicial review that apply to final orders. *See* ORS § 183.482(8) (setting standards of judicial review for final orders in contested cases); ORS § 183.484(5) (setting the same standards for final orders other than contested cases). Judicial review of final orders is governed by the Oregon Administrative Procedures Act ("APA"), which provides:

> (a) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall:
>> (A) Set aside or modify the order; or
>> (B) Remand the case to the agency for further action under a correct interpretation of the provision of law.
>
> (b) The court shall remand the order to the agency if the court finds the agency's exercise of discretion to be:
>> (A) Outside the range of discretion delegated to the agency by law;
>> (B) Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or
>> (C) Otherwise in violation of a constitutional or statutory provision.
>
> (c) The court shall set aside or remand the order if the court finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact

> when the record, viewed as a whole, would permit a reasonable
> person to make that finding.

ORS § 183.482(8); *Bergerson v. Salem-Keizer Sch. Dist.*, 341 Or. 401, 409, 144 P.3d 918, 923

(Or. 2006).

### B.    Delegative Terms

"When an agency's interpretation or application of a provision of law is at issue, the

reviewing court's standard of review depends upon whether the phrase at issue is an exact term,

an inexact term, or a delegative term." *Coast Sec. Mortg. Corp. v. Real Estate Agency*, 331 Or.

348, 353, 15 P.3d 29, 33 (Or. 2000) (citing *Springfield Educ. Ass'n v. Springfield Sch. Dist. No.*

*19*, 290 Or. 217, 223, 621 P.2d 547, 552 (Or. 1980)). Exact terms "impart relatively precise

meanings, and their applicability in a particular case involves only agency factfinding." *Id.* A

court reviews an agency's application of exact terms for substantial evidence. *Id.* at 353–54.

Inexact terms are "less precise" and, "[a]lthough they embody a complete expression of

legislative meaning, that meaning always may not be obvious." *Id.* at 354. The task of the agency

and the court is to determine what the legislature intended by using those words. *Id.* Delegative

terms "express incomplete legislative meaning that the agency is authorized to complete." *Id.* A

court reviews an agency's decision concerning a delegative term "to determine whether it is

within the range of discretion allowed by the more general policy of the statute." *Id.*

"The legislature may use general delegative terms because it cannot foresee all the

situations to which the legislation is to be applied and deems it operationally preferable to give to

an agency the authority, responsibility and discretion for refining and executing generally

expressed legislative policy." *Springfield Educ. Ass'n*, 290 Or. at 228. Examples of delegative

terms include "good cause," "fair," "undue," "unreasonable," and "public convenience and

necessity." *Or. Occupational Safety & Health Div. v. CBI Servs., Inc.*, 356 Or. 577, 585, 341

P.3d 701, 706 (Or. 2014) (citing *Springfield Educ. Ass'n*, 290 Or. at 228). In evaluating whether

a statutory term is delegative, Oregon courts consider: (1) whether the term is similar to others

that Oregon courts have concluded are delegative in nature; (2) whether the term is defined by

statute or instead is readily susceptible to multiple interpretations; (3) whether the term requires

the agency to engage in policy determination or make value judgments, as opposed to

interpreting the meaning of the statute; and (4) whether the larger context of the statute suggests

that the legislature did or did not intend a term to be regarded as delegative. *Id.* at 590–91.

Under these four factors, "substantial public harm" is a delegative term. First, the term is

similar to other terms that Oregon courts have concluded are delegative, such as "public

convenience and necessity." *See Springfield Educ. Ass'n*, 290 Or. at 228. "Substantial public

harm" calls for completing a value judgment that the legislature has only indicated. It requires

OWRD to evaluate and determine what harms are "substantial" and sufficiently "public" to

justify denying a stay. *Cf. McPherson v. Emp't Div.*, 285 Or. 541, 550, 591 P.2d 1381, 1386 (Or.

1979) (noting that "good cause" requires agency to evaluate what are and are not "good" reasons

for giving up employment).

Second, neither "substantial public harm" nor any of the individual words that compose

the term are defined by statute. Whether a particular situation will result in substantial public

harm is readily susceptible to multiple interpretations.

Third, the term requires OWRD not only to interpret the meaning of the term, but also to

engage in policy determination and make value judgments as to what constitutes "substantial

public harm" in each case. *Cf. CBI Servs., Inc.*, 356 Or. at 591 (noting that "reasonable

diligence" requires agency to engage in value judgment about what is "reasonable" and what is

"diligence" under the circumstances of each case).

Fourth, the context of the statute suggests that the legislature intended the term to be regarded as delegative. The statute gives OWRD the discretion to deny a stay "if [OWRD] determines that substantial public harm will result from staying the final order." ORS § 536.075(6). In other words, the statute authorizes OWRD to make a "substantial public harm" determination in each case. There would be no reason for the legislature to include the phrase "if the commission or department determines" if the term "substantial public harm" were not delegative. *See State v. Clemente-Perez*, 357 Or. 745, 755, 359 P.3d 232, 239 (Or. 2015) ("As a general rule, [courts] assume that the legislature did not intend any portion of its enactments to be meaningless surplusage." (citations omitted)). In sum, the Court concludes that "substantial public harm" is a delegative term.

## II.    Substantial Public Harm

Petitioners argue that OWRD has failed to establish that "substantial public harm" will result from allowing the stay to remain in place. Pet'rs' Br. 3, ECF No. 22.[6] Specifically, Petitioners argue: (1) OWRD cannot show Petitioners' water diversions constitute harm because if Petitioners do not divert the water, Reclamation will divert that water for another purpose, so Petitioners' water diversions have no effect on UKL elevation levels; (2) OWRD cannot show a public harm because harm to a single water user does not constitute a public harm; and (3) OWRD disregards the word "substantial" in its interpretation that any reduction in UKL elevation levels constitutes a substantial harm. *Id.* at 3–4. The Court addresses each argument in turn.

---

[6] In its orders, OWRD explained that "[t]his order denying stay does not affect [Petitioners'] rights, if any, to substantive review of the regulation orders in the circuit court pursuant to [Petitioners'] petitions for judicial review." OWRD Order Denying Stay at 1, ECF No. 23-1. Petitioners acknowledge that, "[a]lthough the merits of Petitioners' [petitions for judicial review] are not at issue in assessing the validity of OWRD's Orders Denying Stay[s], the relationship between Reclamation and the Klamath Tribes does bear on OWRD's ability to prove 'substantial public harm.'" Pet'rs' Br. 6, ECF No. 22. The Court agrees.

### A.    Harm

As mentioned, Petitioners argue OWRD cannot show Petitioners' water diversions will cause any harm to the Tribes or have any effect on UKL's elevation levels. *Id.* at 4, 9–10. Petitioners emphasize that Reclamation controls UKL's elevation levels. *Id.* at 9. Petitioners' argument is unavailing.

First, the Tribes' water rights concerning UKL were quantified and determined in the Klamath Basin Adjudication. UKL is to be maintained at specific minimum elevation levels pursuant to the Tribes' determined claim, KA 622. *See* Removal Notice, Ex. 1 at 22, ECF No. 1-1. Under Oregon water law, the Tribes are the senior water-right holder entitled to all water within the bounds of the specific elevation requirements set forth in KA 622. *See Caviness v. La Grande Irrigation Co.*, 60 Or. 410, 421, 119 P. 731, 735 (Or. 1911) (noting that a senior water-right holder "may take all the water he can use reasonably and without waste for a beneficial project, although it may be the lion's share and none may be left for those who come afterwards" and that the senior water-right holder "ow[es] no duty ... to those endeavoring to use the water by title subsequent to his own"). Pursuant to the prior appropriation doctrine, the Tribes' water rights may be fulfilled entirely before junior water-right holders receive any water at all. *See Benz*, 94 Or. App. at 81. Permitting Petitioners to divert water when the Tribes' water rights remain unfulfilled would run contrary to the prior appropriation doctrine and undermine the very foundation of Oregon water law.

Second, Petitioners cannot shift all responsibility for the harm to Reclamation simply because Reclamation operates the Klamath Project pursuant to its ESA obligations, the Tribes' fishing and water rights, and other senior appropriators' water rights. Reclamation is required to comply with the ESA in operating the Klamath Project. *Klamath Irrigation Dist.*, 48 F.4th at

940–41. And, "[a]t the bare minimum, the Tribes hold rights to an amount of water that is at least

equal, but not limited to, the amount necessary to fulfill Reclamation's ESA responsibilities." *In*

*re Klamath Irrigation Dist.*, 69 F.4th at 939 (citations and quotation marks omitted).

Reclamation must release water from the Link River Dam to comply with its obligations to

downstream Tribes and ESA-listed species. *See, e.g., id.* at 938 (noting that Reclamation must

maintain specific water levels in UKL and specific instream flows in the Klamath-Trinity River);

*Klamath Irrigation Dist.*, 48 F.4th at 941 ("Reclamation must operate the Project consistent with

the federal reserved water and fishing rights of the Klamath, Hoopa Valley, and Yurok Tribes

that predated the Project and any resulting Project rights."); *Yurok Tribe v. U.S. Bureau of*

*Reclamation*, --- F. Supp. 3d ----, 2023 WL 1785278, at *19 (N.D. Cal. Feb. 6, 2023) (holding

that an OWRD order prohibiting Reclamation from releasing stored water from UKL was

preempted by the ESA and thus violated the Supremacy Clause). The irrigators' rights are

"subservient" to the Tribes' rights and Reclamation's ESA responsibilities. *In re Klamath*

*Irrigation Dist.*, 69 F.4th at 939.

Petitioners' position ignores the direct impact that their water diversions have on

Reclamation's ability to comply with its obligations to the Tribes, ESA-listed species, and other

senior appropriators.[7] When there is insufficient water to meet minimum elevation requirements

in UKL, Petitioners' continued water diversions make it even harder for Reclamation to ensure

UKL elevations can reach levels that comply with the Tribes' water rights. In other words,

Petitioners' continued water diversions move Reclamation's "nearly impossible" task of

---

[7] Petitioners' contention that Reclamation "will cause UKL's level to be at 4,139.2 feet at the end of the season"
under Reclamation's 2023 Drought Plan is speculative and mischaracterizes Reclamation's plan. *See* Pet'rs' Br. 6,
ECF No. 22. The Drought Plan states Reclamation will "operate the Project to achieve an end-of-season UKL
minimum elevation of 4,139.2 feet." Martin Decl., Ex. 2 at 3, ECF No. 23-2. Reclamation's goal is a *minimum*
elevation. Nothing in the document suggests that Reclamation will prevent UKL's elevation levels from exceeding
4,139.2 feet at the end of the season.

balancing interests closer to being actually impossible. The claim that junior water-right holders'

water diversions have no effect on UKL elevations—and therefore result in no harm to the

Tribes—fails to appreciate how Reclamation operates the Klamath Project.

      With these considerations in mind, OWRD's interpretation of "harm" in "substantial

public harm" is within the range of discretion allowed by the more general policy of the statute.

OWRD noted that the Tribes' determined claim KA 622 authorizes minimum lake levels in UKL

"to establish and maintain a healthy and productive habitat to preserve and protect the Tribes'

hunting, fishing, trapping and gathering rights[.]" OWRD Order Denying Stay at 2, ECF No. 23-

1. OWRD then determined the Tribes would suffer harm from junior appropriators' continued

diversion of water from UKL. *Id.* at 3. There is no question here that junior appropriators' water

diversions contribute to decreased elevations in UKL. There is also no question that, under

Oregon water law, the Tribes are entitled to all water to satisfy KA 622 before junior

appropriators are entitled to any water. Viewing the record as a whole, substantial evidence

existed for OWRD to reasonably determine that junior appropriators' water diversions would

result in harm to the Tribes.

      **B.**    **Public**

      Petitioners next argue OWRD cannot show a public harm because the Tribes are a single

water user and harm to a single water user does not constitute a public harm. Pet'rs' Br. 17, ECF

No. 22. The Court concludes that harm to a sovereign nation does constitute a public harm.

      OWRD defined "[t]he public that is harmed by the automatic stay" as "that community of

persons that has a reasonable expectation that the regulatory order will be enforced." OWRD

Order Denying Stay at 3, ECF No. 23-1 (citation omitted). OWRD then determined the Tribes

"are the sovereign and public community that has a reasonable expectation that the regulatory

orders shutting off junior water rights will remain effective during the pendency of review of any petitions for judicial review of those orders." *Id.*

First, OWRD's interpretation of "public" in "substantial public harm" is within the range of discretion allowed by the more general policy of the statute. In *Evans*, the Court of Appeals considered the meaning of "public" in the context of correctional facility discipline and determined that the public "includes inmates other than the one who is the subject of the disciplinary order, correctional facility staff and visitors to a facility, as well as the public at large." *Evans v. Or. State Penitentiary, Corr. Div.*, 87 Or. App. 514, 525, 743 P.2d 168, 173 (Or. Ct. App. 1987). The Court of Appeals noted that "[a]ll of them have a reasonable expectation that correctional facilities will be secure." *Id.* This reasoning can extend to the water use context, where the public is a community of persons who have a reasonable expectation that their senior water rights will be enforced.

Second, viewing the record as a whole, substantial evidence existed for OWRD to reasonably determine that the Tribes are "the sovereign and public community that has a reasonable expectation that the regulatory orders" will be enforced. OWRD Order Denying Stay at 3, ECF No. 23-1. The Tribes are a sovereign nation responsible for its people, communities, and resources. OWRD noted that "[t]here are presently over 5,000 individual enrolled members" of the Tribes. *Id.* at 2. OWRD also found that:

> The Tribes' culture, cosmology and way of life are based upon hunting, fishing, gathering and trapping in their aboriginal homeland. Treaty resources provide food, clothing and tools for tribal families. Treaty resources are also central to the Tribes' religious and cultural practices and have been so since before the creation of the Klamath Tribes' reservation.

*Id.* In short, a sovereign nation is the public even if the Tribes are collectively a single water user. This Court will not ignore the people, communities, and resources that depend on the Tribes' water rights.

### C.    Substantial

Petitioners argue OWRD disregarded the word "substantial" when OWRD determined that any reduction in UKL elevation levels constitutes a substantial harm. Pet'rs' Br. 17–18, 23–24, ECF No. 22. But the question of whether harm to the Tribes is "substantial" is not dictated by the amount of water a junior water-right holder diverts from UKL.

OWRD defined "substantial public harm" as "a material harm or injury having real importance or consequence upon the public." OWRD Order Denying Stay at 3, ECF No. 23-1 (citation omitted). OWRD then determined:

> The harm the Tribes will suffer by continued diversion of water from Upper Klamath Lake by junior water right holders is material because the water in Upper Klamath Lake is essential to the water-dependent treaty resources protected by determined claim KA 622. The harm suffered is substantial because the total quantity of water described in KA 622 is necessary to support those treaty resources sustained by the waters of Upper Klamath Lake. Any reduction of water, caused by the diversion of water by junior appropriators, however incremental, decreases the amount of water available in Upper Klamath Lake and constitutes a substantial harm to the Klamath Tribes.

*Id.* (citations omitted).

First, OWRD's interpretation of "substantial public harm" is within the range of discretion allowed by the more general policy of the statute. "Substantial" can be defined in the following ways: (1) of, relating to, or involving substance; material; (2) real and not imaginary; having actual, not fictitious, existence; and (3) important, essential, and material; of real worth and importance. *Substantial*, Black's Law Dictionary (11th ed. 2019). These definitions are

consistent with OWRD's interpretation that a "substantial public harm" is "a material harm or injury having real importance or consequence upon the public." OWRD Order Denying Stay at 3, ECF No. 23-1.

Second, viewing the record as a whole, substantial evidence existed for OWRD to reasonably determine that the public harm here is substantial. The statute specifically addresses enforcement of a final order that regulated off a diversion in favor of a senior determined claim. *See* ORS § 536.075(7). Oregon follows the prior appropriation doctrine, which provides that "[a] junior appropriator's water right cannot be exercised until the senior appropriator's right has been satisfied." *Benz*, 94 Or. App. at 81. The Tribes are entitled to the minimum elevation requirements in the UKL pursuant to their determined claim KA 622. As explained, allowing Petitioners to divert any amount of water when UKL levels are below the required minimum levels set forth in KA 622 would run contrary to the prior appropriation doctrine and undermine the very foundation of Oregon water law. It makes no difference how much water Petitioners divert when the Tribes' senior water rights are unfulfilled. The Tribes are entitled to all water in UKL within the minimum elevation requirements set forth in KA 622 before junior appropriators are entitled to any water. *See Caviness*, 60 Or. at 421.

Additionally, the Tribes' determined claim KA 622 was determined and measured in terms of minimum elevation levels. In determining the Tribes' claim, the ALJ noted that these minimum elevation levels were "necessary to establish a healthy and productive habitat to allow the exercise of the Klamath Tribes' hunting, fishing, trapping, and gathering rights guaranteed by the Treaty of 1864." Martin Decl., Ex. 3 at 9–13, 31, ECF No. 23-3. If this Court permits junior water-rights holders to divert water because their diversions only slightly reduce UKL elevation levels, the Court would be disregarding the measurement requirements set forth in KA 622 and

would be imposing its own judgment as to how the Tribes' determined claim should be quantified and enforced. But this Court has no authority to second guess the Tribes' determined claim under the KBA or to set new standards for KA 622.

Finally, OWRD's determination is also supported by numerous decisions holding that the Tribes and Reclamation are required parties to litigation seeking to alter Reclamation's ability to fulfill the requirements of the ESA. *See, e.g., Klamath Irrigation Dist.*, 48 F.4th at 943–44 ("[A] suit ... that seeks to amend, clarify, reprioritize, or otherwise alter Reclamation's ability or duty to fulfill the requirements of the ESA implicates the Tribes' long-established reserved water rights."); *Klamath Irrigation Dist. v. Or. Water Res. Dep't*, 321 Or. App. 581, 593, 518 P.3d 970, 978 (Or. Ct. App. 2022) (holding that Reclamation was an indispensable party that could not be joined and that, in equity and good conscience, the action could not continue in Reclamation's absence). Such decisions underscore the real importance and consequence upon the public of any diversions of water that impact the Tribes' water rights and Reclamation's ESA obligations.

**ORDER**

For the reasons set forth above, OWRD's July 2023 Orders Denying Stays are AFFIRMED.

IT IS SO ORDERED and DATED this _____9_____ day of August, 2023.

MARK D. CLARKE
United States Magistrate Judge